Case numbers 1837-12, 1837-89, 1837-94, 1838-00, 1838-81, and 1839-20. Sheldon Gordon et al. v. David Dadante et al. Argument not to exceed 15 minutes per side. Ms. Workman-Farago, you may proceed for the appellant. Before you begin, how many will be arguing? Just the two of you? Yes, Your Honor, I'll be arguing, and then Mr. Cohen will be arguing on behalf of David Dadante. Okay. And then please make a conscious effort to… I will do my… Thank you. …best. May it please the Court, I'm Amelia Workman-Farago. I'm counsel for seven appellants in these consolidated cases that have been collectively referred to as the small parties. My co-counsel in this case are Michael Diamond and Philip Williamson. I would like to reserve the four minutes for rebuttal. Are you making arguments for the people who are not arguing today, or are you actually representing them? I only represent the small parties. However, the arguments of all the appellants herein are very similar. Very similar. There's not too much daylight between the arguments, and you're representing the people who are not arguing here today. I agree with that, as the issues were briefed, Your Honor. May it please the Court. The law is clear that a receiver in an equitable receivership is not entitled to a windfall at the expense of the investors that he was appointed to protect. He's only entitled to moderate compensation. And, in fact, the Supreme Court has set out that in fixing allowances for services to court officers, judges should be most careful that vicarious generosity in such a matter should receive no compensation. That's the case of Ingrid Gilbert. The cases are also clear that fair compensation to a receiver is only moderate compensation. And, in fact, the Court should be careful to avoid even the appearance of a windfall. Nevertheless, what occurred in this case was a windfall. The receiver was compensated generously throughout this case at the rates that he set. And he was paid. He would have got that money even if the plaintiffs had gotten nothing. Your Honor, not only would he have gotten that money, he did get that money. The receiver was first in line and had first priority from minute one of the receivership. To be clear, this receivership was not a destitute receivership from its inception. There were assets identified immediately, including a significant portion of stock in the Intratrac company, which we'll talk about in another minute. But cash started coming in from the receivers' afflicts immediately. And by his first accounting, which he filed about one and a half years into the receivership, he had already billed approximately $1.1 or $1.2 million, and he had received payment of nearly all of that. In fact, his fees were eating up all the cash that was in the receivership. There was only about $8,000 sitting there in cash. So he was consistently being paid. By the time 2017, he had been paid nearly $3.8 million. So he was being compensated throughout the receivership. Not only did he receive that compensation, in 2013, the course of what is fair compensation in this case veered off track and took us on a detour, which brought us to the court today. And that was because in 2013, understanding that Judge O'Malley had presided over the case from the inception, 2005, leading up to 2011, when the case was transferred to Judge Boyko. Two years after that, there was a fairness hearing. The fairness hearing was to determine whether or not the settlement regarding the sale of the Intratrac stock was fair to the receivership. At that hearing, at that point, the district judge, Judge Boyko, after the full hearing was over, he actually raised sua sponte, stating that it would be – he would anticipate that the receiver would be requesting additional compensation based on what the court characterized as the extraordinary recovery. In fact, the court had, or at least the way the district judge articulated it, already decided that Mr. DeTore was, quote, certainly entitled to that. At that point, the court requested that Mr. DeTore brief the issue of whether or not he could be entitled to compensation based, again, on what the court characterized as extraordinary recovery. The receiver did that in January of 2014. In fact, the filing was a combined filing wherein the receiver addressed three things. One was the proposal to distribute 110 percent, as he called it, to – of the principal investment to the investors. There was another settlement issue that doesn't really bear on here. And the third, which was in that combined brief, was the brief about whether or not the court could grant the receiver additional compensation, again, based strictly on this sua sponte raising of the, quote, extraordinary recovery. Yes? Can you just explain one thing? Why were the fees divided into two time periods? I was confused about that. I'm not sure what the nature of the question is. What occurred was Judge O'Malley was presiding over the case, and he was just – the receiver was being paid his regular bill and approved out on the rates. Then we hit the 2013, and the InterTrack stock was sold. When the InterTrack stock was going to be sold, it was going to amount in a recovery of about $36 million. At that point, the court, again, made this characterization and essentially said to the receiver, tell me what the law is. Can I give you more money? So the only reason that we have pre-sale of stock and post-sale of stock, the only reason we have that division is because the judge's direction to address the fees coincided with the sale of the stock, or was there something else? I would agree with the characterization that you just made, Judge White. But to be clear, the receiver didn't just file and request that the court consider awarding this extraordinary compensation based on the quote, extraordinary recovery. The only law briefed by the receiver in that brief, by the way, is just the law on essentially the reasonableness of compensation that is in the court's discretion to decide what's reasonable. There are no cases that allow this. What is the standard of review? The standard of review with respect to awarding fees generally, they are in the district court's discretion. We're not disputing that. For all the amounts, whether it's the original or the bonus, the additional amount, the raising of the rates, whatever you want to call it. It's abuse of discretion. Judge Prather, I agree that it's abuse of discretion in terms of a court being allowed to set the receiver's compensation. But in that, in this application of law, it should be reviewed de novo. And also, there's a due process violation here because this particular receivership did not just involve – it did just involve the issue of how the receiver should be compensated. The 100-plus investors in this case were investors in a limited partnership. So they had property interests in their limited partnership rights, and they were entitled to due process before the court determined that it was appropriate to distribute $2.4 million over and above the full rate compensation of the receiver to the receiver instead of to the investors. That interest stock was an asset of the IQF fund in which they were limited partners, and therefore they were entitled to the gains on that asset, particularly after having fully compensated the receiver. But weren't they all plaintiffs? They were – they were not the original plaintiffs. They were added as plaintiffs, and for the protection – They were. Do they eventually get notice? They got notice, but the issue that I would point the court here to where the due process violation comes in is this. The trajectory that the court proceeded on after that 2013 hearing was a long road. This issue wasn't decided very quickly. It endured absolutely. It was the number one thing going on in the receivership from 2013 to the present, and there were numerous rounds of briefing, numerous rounds of argument. The case was then – the judge, although in 2014 held a hearing and said that he would be ruling expeditiously because everyone had been waiting a long time, he instead took some other courses and then eventually referred the matter to the magistrate judge for a rehearing and report and recommendation. That ended up being reheard, and then we came up with a report and recommendation, which recommended a $1.2 million bonus to the receiver, which was essentially a 30 percent markup of every dollar – under Judge O'Malley. And then we get to the district court judge, who then adopts in part and modifies in part that recommendation and doubles it to $2.4 million, more than 50 percent again. He picked a route. He picked another route. But the due process – I'm sorry. To address your question on the due process issue, it's this. If you look at the court's opinion, it's very clear that the court determined that the investors had waived their right to argue about the fees prior to 2014, prior to January of 2014, which was sort of the month after the fairness hearing. And the court said that while the investors had waived their argument, apparently – and you can glean from the opinion – that the court determined the receiver had not waived an argument to argue that all the fees that he had requested at his regular hourly rates were not reasonable. He allowed the receiver to argue for free conference. There are two issues. One is the number of hours, and one is the rate. Yes. He let you argue about the rate. He didn't say you couldn't argue about the rate before 2014. He just said the number of hours is just a decided fact. We're not going into that. The receiver couldn't argue about his number of hours, right? The court actually said that we waived the right to challenge the billings before 2014 at all and then had the receiver refile an accounting only from 2014 present. The court's order in this case actually said it would have been inappropriate for the court to allow the magistrate judge to review those billings because they had already been approved in pay. And yet the math – the plain math in this case is that the court did take all 17,000-plus hours that were billed in the receivership, including all the approved and paid hours years before, and marked them up and applied a high rate of commentary. They could challenge what he did there and say, yes, you shouldn't do that. I'm just quibbling with whether it's really a proceedable due process issue or whether it's an issue of whether they waived the argument or not. I argue that saying that the – finding that the investors were not entitled to challenge the comp but allowing the receiver to challenge the reasonableness of the comp was, in fact, a due process issue. So I understand you do, but you can see that it could as easily be characterized as a dispute as to what arguments you could raise at what particular points in the development of the case. I hate to turn all such arguments into proceedable due process. I mean you have a pretty good argument that they didn't – that they should have been able to object to payments that were doubled retroactively basically. So they're in a position in the litigation where something they've already paid and they no longer have a chance to challenge it because it's all settled. And then they have to pay more and they don't get to object to that. But they could object to the fact that they didn't get to object to it. Which we objected to the magistrate judge's report recommendation. The court decided the fees would be in the monopoly area. Do I understand correctly what the judge said is that you can't contest those fees in the sense that you can't argue about the appropriateness. You can't argue about the number of hours spent. I mean this has already been decided, but you can argue about the proposed change to the hourly rate. It wasn't about the hourly rate, Your Honor. The hourly rate was a construct. We were allowed to argue about whether or not the receiver was entitled to additional compensation. The issue of the hourly rate that came up, the bottom line on that is the ARPC report, sometimes referred to the Kennedy report, that was used in this case by the court to rely on for hourly rates and then determined that the receiver should actually get retroactive compensation to the highest end of hourly rates for management consultants. That was originally ordered under Judge O'Malley and then supplemented under Judge Boyko. It was ordered under O'Malley for the purpose of proving whether or not the rates were reasonable. The first page of the Kennedy report, if you just look at 482-1, the Kennedy report, to the extent that it should be considered at all, was a finding that they were reasonable. That's the rates that were already paid. So one thing I don't understand is you have a Kennedy report and it says that, yes, this is within the reasonable range, and I assume it gave a reasonable range? The original report gave a range for management consultants. Okay. I don't understand. Did that rate change in the second report? The consultants supplemented for rates going from, I think it was maybe 2008 to 2013 because the prior report had been done under the prior judge, and so it didn't have all the years in it. And what the judge here did was took the highest end from 2013 and marked up the entire case. I know, but I'm still trying to – okay. So the first report, do you happen to remember what the high end was in the first report? I believe it was in the 200. Okay. And then how many years later was the second report? The second report was in, I believe, 2014 or 2015, and at that point the high end rates were 475. So what the court took here was it applied an ultimate rate of – I know what it did. I'm just trying to find out about these reports. So did the range change considerably in those two reports? The range did change considerably because the receivers – the original report, the RFPC report, determined that the receiver's rate was within the range. Yes, I understand that. And when I asked you what was the high end of the range, you said it was in the 200s. I believe that's correct. Okay. I'm not sure off the top of my head. And what year was that? 2006 or something? No, I believe that was in 2009. Oh, okay. Again, I'm not certain of the year. I apologize. And then five years later the range had more than doubled? The high end had doubled? The high end range was up to 459 – up to 475, I'm sorry. And had the low end doubled too? If you don't know, it's okay. I don't know off the top of my head. I don't. Okay. And then over time the receiver's fees got higher just in terms of what he was submitting. Do we know what the yardstick was for that? He just continued to increase them at his hourly rates. By the end of the case, the receiver himself had rates over $300. And to be clear, the rates that he charged to his receivership, they were never disputed as being standard hourly market rates. They were what? They were never – they never disputed the fact that he was charging us a full market rate. This was not like the cases where the court applied where attorneys' fees have – attorneys have received a reduced interim award. Those cases don't apply here in the first place, but that's not what was going on here. Okay. I believe that was it. Thank you. Well, that's my time. If it pleases the court, I'm Josh Cohen. I'm here on behalf of the Federal District of Dodd-Dante, and I'd like to reserve two of my ten minutes for rebuttal. The issue presented by Mrs. Dodd-Dante's appeal is whether the trial court abused its discretion in refusing to return the $164,000 taken by the receiver from her credit reading account. Mrs. Dodd-Dante is the wife of David Dodd-Dante, who's the bad guy in this Ponzi scheme case. He's the one who ran the partnerships and did all of his conduct as an issue in the case. $164,000 represents proceeds from a sale of a house that was – a house that was bought a few years earlier with funds that were taken from the partnership. There's no dispute that the funds used to buy that house originally came from the partnership. Well, wait a minute. This is part of the proceeds of the house that was sold for the agreement, right? No. This is a separate set, an earlier set of previous houses that were sold. This was a house that was sold before any of the problems came to light. And back in – I believe it was 2005, they had bought this house, and the – it's been determined that that – or earlier than that. And it had been determined that that earlier house had been purchased with partnership funds. So it was then sold a few years later. When you say partnership funds, are you talking about these partnerships? Yes. It wasn't nominally the same, but it was the same partnership. It was among the partnerships for which the receiver had responsibility. Okay. So the house was bought with partnership funds? The original house was bought with partnership funds. It was later sold by the Dodd-Dantes. And the proceeds of that were put in Mrs. Dodd-Dantes' credit union account. Okay. And as part of Mr. – of the receiver's marshaling assets that were supposedly misappropriated by Mr. Dodd-Dante, he took hold of the $164,000. And there's never a formal adjudication that the original taking of the partnership funds to buy that house was improper. There's no question that the funds came from the partnership. There's never an adjudication that it had been improper. He could have taken it for a proper purpose or whatever. The only judgment that was ever entered with respect to Mr. Dodd-Dante's conduct was a stipulated judgment entry that was entered pursuant to a settlement. And that took place at the beginning of 2007. And the receivership on behalf of the partnerships and on behalf of all of the partners entered into an $8.5 million settlement with Mr. Dodd-Dante. Mrs. Dodd-Dante was a nominal party to that settlement. And for collateral reasons, one of which was that she was transferring her interest in their new house in contribution towards satisfying the $8.5 million judgment. The settlement also preserved her claim to the $164,000 that the receiver had. And the receiver also preserved his claim to it. So the question comes down to the way we see this case. There was no independent claim that the receiver – But at some point, she asked to get the money. Right. And the court said – no, the court at that point, I assume, made the determination. The court said it came from the partnership. No, the court said, I'm going to postpone any decision on this until the time the court is making final distribution of the funds. So we're going to postpone this issue. Put it off until the end. And the settlement agreement, leading to the stipulated judgment entry, preserved each of the parties' respective rights under that order. So this is the document. You still can claim the shares. The receiver, you can still claim his shares. And in the interim, that order took place before the stipulated judgment entry. And our position is that after the stipulated judgment entry came into effect, the only claim that the receiver could have on that money was if it went to satisfy – to go to satisfy the $8.5 million liability. Because the money that was taken, $164,000, was fruit of David and Dante's alleged misappropriation. And liability for that misappropriation had been liquidated at $8.5 million. And to the extent that that judgment had been satisfied, the $8.5 million, there would be no continuing, ongoing basis for the receiver to claim that money. The receiver ended up collecting far more than $8.5 million. He ended up collecting $59 million. And there's no question that the money that he collected – So this is a dispute about what the settlement meant. It's a dispute about what the settlement meant. It's a dispute about whether the amounts collected by the receiver actually satisfied the judgment that came about pursuant to that settlement. Okay. Can I ask a question? Go ahead. Okay. I'm looking at – I found this part of the case in Canada. I'm looking at the reply brief of Beverly and Dante. So that's your brief. Yeah. Okay. Over on page 3, where do you make the following analogy? If David de Dante himself personally satisfied the $8.5 million obligation under the settlement agreement, the investors would have absolutely no right to get additional money from him, Mrs. de Dante, or any of the other signatories to the agreement. The receiver's recovery of $59 million satisfied the obligations. That makes it sound like once the $8.5 million was paid, de Dante gets the rest of the $59 million. He does not get the rest of the $59 million. That's what this argument sounds like. I apologize, Your Honor. You said the receiver cannot use, but they can get the $164,000, which is also part of that money, right? Your Honor. That's what I'm not understanding. The question is who – the question, as I understand it, ultimately, is who has this money. If it's Mrs. de Dante's money and she has no obligation to pay the beneficiaries of the settlement agreement that she signed, then I guess she gets to keep the money. If the money is part of what the receiver collected that is ultimately oweable to the various parties who win this case, then I don't see why she should get it. If that's your analogy, that's against you, I guess, to be honest with you. The $164,000 was supposed to be kept in a separate account. Separate from the other – Just so we could watch it. But still – In a separate account. It's money that resulted as part of the fraud, are you denying? But – Is that money? No. The issue – the ultimate determination of whether that was true or not was tabled until the end of the case. At the time it was tabled, there had been no determination of whether there was liability or not on behalf of David de Dante. The receiver's collection of these assets can't be divorced completely from a finding of liability. He didn't have the right to go out and marshal everything. That argument seems to say he gets the $59 million back minus aid, so $50 million he gets. That argument was imprecise, I guess, and – The argument you're making now seems to be the same argument. No, what I'm saying is that his liability was $8.5 million. It's been satisfied. But there's this other fund there that has a lot of money in it, right? If this $165,000 is in that fund, then it seems logical that neither de Dante should get it back. If it's somehow not part of that, then what's it doing in there? It technically is not supposed to be part of that. It's technically supposed to be part of a separate fund. A separate fund that is waiting for determination by the court at time of distribution to determine who has the right to it. And that's the determination. If it's fraud-infected, it seems like it ought to go to the fraud victims first. There's been no determination. If it's not fraud-infected, then somehow it got in there, but it ought to go back to her. Your Honor, there's been no determination that it's fraud-infected. There has been a determination that the money— Well, what was the district court's reason for not— The district court's reason was that, number one, is that the home that was purchased, that eventually was sold to the 164, was purchased with partnership funds. And that, number two, is because the settlement agreement excluded the 164, the claim to the 164, the respective claims to the 164 from the settlement, that somehow satisfaction of the judgment could not release that claim. Just like it didn't release the other $50.5 million. Your Honor, when the judge preserved the—or postponed the decision on what to happen to the 164, it was dependent on a few things. It was dependent mainly on a determination of whether there was liability for that transaction. There's no question, as I said, that this money came from the partnership. But it could have been for any number of legitimate reasons. And that's why you had trial. The receiver wasn't an authority unto itself. The judge ultimately was supposed to adjudicate those facts. There was no adjudication because there was a settlement. The settlement was that David Adante's liability for misappropriation and everything else was the $8.5 million. So at that point, at that judgment, the right to retain the $164,000 turned upon whether it could go to set what was needed to satisfy the $8.5 million. The receiver marshaled assets, sold in a track stock for far more than was necessary to satisfy the $8.5 million. Why did the victims get the $50 million? They settled for $8. Why should they get the $50 million? Because the assets of the partnership that were garnered sold for that, the in a track stock, sold for $35 million. And that was their property. That was their property. That was their property. But this is a different story. This was an asset that in order for the receiver to claim that this belonged to the estate, there had to be a determination that David Adante committed fraud. The determination was $8.5 million liability. It was a stipulated judgment. And so the nature of the inquiry changed. I've got a couple of questions. As I understand the settlement, they released each other from all claims. But the settlement expressly stated that those releases do not extend to any claims that either your client or the fund have to that $150,000 claim. That's correct. They don't release the claims of Mrs. Adante or the plaintiff's partnership, receivership, had to the funds. Okay. So it's not a matter of that the release gave her a right to the money. The release did not give her a right to the money. All right. So the question is, who does the money belong to? And the judge said that the money came from the partnership and therefore it belongs to the partnership. That was part of his reasoning, yes. I can't hear you. What? That was part of his reasoning, yes. Okay. So when it came time to distribute this money or decide, was there argument? There was no argument on that point, Your Honor. There was no argument. But what was the procedure employed for distributing this money? Did you get to file a brief? Did you get to address? We filed a brief. We filed a reply brief. We had an opportunity to contest the issue in district court. Okay. In that reply brief or in your brief, did you explain why it was proper to use the partnership money to buy the house? You say here it might have been proper. You know, it might not have been proper. But did you explain in those briefs, did you tell the court why just because it came from the partnership doesn't mean that they should get it? No, Your Honor. We didn't explicitly address that point. Well, isn't that important? It was important. I mean, it makes sense to me for the judge to say, okay, this isn't money that she happened to have had that was in escrow to see if it was going to be needed for the $8.5 million. This was money that is traced directly to partnership money without an explanation as to why that was proper. The point that we did make, Your Honor, was that liability for this sort of misconduct, this misappropriation had been liquidated or set at $8.5 million. So whether this was proper, improper, even assuming that it was improperly taken, the money for the purchase of the house, that liability had been satisfied. So it didn't make a difference anymore as to whether we could prove whether it – Well, can't you read this very explicit qualification saying that the liability regarding that race was not decided and it wasn't released? Your Honor, again, this is getting somewhat technical, but again, I would ask who has the burden of proof with respect to that. I mean, they're the ones that are trying to take money that was not only hers and it was taken, not us. All right. Thank you, Your Honor. Good morning. May it please the Court, I'm Rob Glickman. I'm counsel for the IVF Fund Receivership Estate and the Receiver Marketory. I have been counsel for the Receivership Estate since 2006. So if I could, before I begin, I would like to address a couple of the questions that Judge White had. Judge, the reason that the fees are split pre-stock sale and post-stock sale in the court's orders and throughout the docket has to do with the way that the receiver's bills and the receiver's professional's bills were provided to the court and the approval process. That changed after the sale of the stock for a number of reasons. The most important one being that the receiver was privy to insider information regarding a publicly traded company that could not be disseminated. The other reason was that until the stock sale, there was so much, not just distrust, there was so much animosity towards the receiver from some but not all of the investors that providing them information, originally Judge O'Malley felt, would hurt the receivership estate. When such information was provided, for example, the receiver and myself found ourselves subject to both criminal police reports and independent civil actions brought against us independently by investors, I would like to note, not investors that are represented at the accounts table. So that change happened. You're the receiver, right? I'm sorry? You're the receiver, right? No, I'm not. You're the? I'm a lawyer for the receiver. For the receiver? Yes. You're representing the receiver. I apologize, I misunderstood your question because I have asked. I just want to make sure who's representing whom. I'm getting under water. Just the receiver and the receivership estate. Receivership estate. Judge White, you asked questions regarding what we term the Kennedy report. I'm holding it. It's document number, this is the amendment to it. It's document number 613. The high-end rate in 2006, as presented in that report, was $373, and that moved to a rate of $475 as of 2013, if that is at all. And the low-end? The low-end for principals and partners was $215, which was higher than that charged by the receiver in 2006, and $245 as of 2013. Also, and this does get confusing, that's not the high-end of professionals. That's the high-end of the first three-quarters of professionals. That only gets to the 75th percentile. So 25% of professionals are higher than that. So it's not the 100th percentile that gets to the $475 in 2013. It's the 75th percentile. And that's the same thing on the low-end? It is, and that's stated specifically in the report. In fact, in both. So Judge Boyko, in his order, stated that in his many years on the bench, there's never been a case like this one. In my experience, I agree. The other counsel who are on this case know me. I came from a prosecutor's background and a public defender's background and a common police court judge. And I have seen my share of theft cases and even my share of Ponzi scheme cases. I was lucky enough to be the victim of a securities Ponzi scheme case. And I've never seen one where the victims get 110% of their money back. I've never seen one where they get 100% of their money back. Is that 110% of their investment? It is. Not 100% of what their investment plus interest? Yes. That's accurate. Which would have been a lot more over 10 years, correct? Well, I don't know. I mean, I know the briefs talk about, you know, index funds. I'm just thinking of free trial interest. Might be a lot more than 110%. It would be. But again, this is a Ponzi scheme case. And when this – when counsel stated that when we took over this case, there were tremendous assets, that's just not true. There were 4 – there were approximately 4 million shares of Intertrack stock. It was almost – and by almost, I mean 90-some percent completely encumbered by margin of that. With five brokerage firms all calling that margin of that. But your client had expertise that they hired, right? I don't know that anyone had expertise in anything like this, but he certainly did well. They became expert and did well. Yes. But that's what they were paid to do. Yes, he was – that's what he was paid to do. They were paid, and they were paid first. No. No? That is incorrect. Actually, the – both Judge O'Malley and Judge Boyko, while they may have approved fees, only permitted the receiver and counsel to be paid during certain periods of time because the court – Why didn't they have priority over any money that the victims would get? Yeah. I would say yes and no. Generally, a receiver will have priority, but if there is insufficient funds in a receivership estate in the mind of the judge to pay the receiver and pay out funds to other creditors, including victims, it is within the judge's discretion. And in fact, cases are cited in everyone's briefs to this court where judges have determined even though the receiver has an agreed-upon hourly rate and even though there's money to pay the receiver, it would be inequitable to do so, and that fee is reduced. So this is a federal equity receivership. The judge has the authority at any time to accept, reject, or amend the fees of the receiver, his professionals, or for that matter, any other post-receivership creditor that's in the case. But they've got to use their discretion without abusing their discretion, right? I totally agree with that. So how is it discretionably acceptable for one party to get everything he – fully compensated for everything that he contracted to do and did well for his client and for the other party not to get made whole? You say, well, he did get made whole, but if you look at interest or if you look at the time value of money, they're not being made whole. So I would think that making them whole would be to make them whole along those lines and everybody would be made whole rather than having one party get a substantial bonus or amount of money that some people might call a bonus. Whereas the victims, because they brought suit and because they're lucky and because they hired very competent people as receivers indirectly, got substantial recovery but not full recovery, I would see. I'm having trouble seeing how that's – well, that's not an abusive discretion. Well, let's look at how the court, both Judges O'Malley and Judge Boyd, go exercise their discretion. Okay, this isn't Judge O'Malley's decision. But no, it isn't except that I have to go back to Judge O'Malley because it implicates Judge Boyd. We could reverse you without saying O'Malley did one thing wrong. I wouldn't suggest Judge O'Malley did anything wrong, and yes, he could do that. But I want to start with Judge O'Malley because one of the things Judge O'Malley did when confronted with challenges to receivership fees and expenses was hire an independent, third-party company that had no relation to any party in the case or the receiver or, for that matter, our jurisdiction. So it was somebody completely unfamiliar, specifically from Washington, D.C., and that was the first Kennedy report. So Judge O'Malley did that. You're talking about how much more to give. That was the first report. In the first report, that was merely to determine whether the fees being charged by the receiver and his professionals were reasonable because investors were alleging they weren't. How does that help you? I don't see how it helps you at all. I'm just trying to put that into context, Judge, because then after Judge Boyko came on the case and after the sale of the stock, Judge Boyko ordered that same third-party company to determine whether the fees charged by the receiver and his professionals were, again, reasonable or not, and that created the updated report. Judge Boyko then determined that he wanted a third-party magistrate to review this issue after it had already been briefed. And Magistrate Judge Greenberg provided to Judge Boyko a report and recommendation that determined not that the receiver should receive a bonus. The only place the word bonus is used is in appellant's briefs. Determined that the compensation received by the receiver… Do you have another word we can use so that we won't use the wrong word? I like the term… Bonus or something? I couldn't hear you. I'm sorry. I'm just joking. Can we just make up another word? Sure. It's a prickly pear, but remember it is – it gives you more money than they originally contracted. And Magistrate Judge Greenberg found in his report and recommendation that it required more money for the receiver to be reasonably compensated. And Judge Boyko, in reviewing the objections to the report and recommendation, determined in his discretion that it required more money for the receiver to be reasonably compensated. One of the cases that's cited by appellants in this matter is Mays v. Varani, which is a case out of the Northern District of Texas. And in that instance, a district court judge was asked by a receiver to award additional compensation because the receiver achieved what the receiver viewed as an outstanding result. And the judge in that case said, no, I feel you're being compensated fairly under your hourly rate. That's a 2003 judgment from the Northern District of Texas. Coincidentally, the reasonable hourly rate that the receiver was being compensated is exactly $4 less than the hourly rate applied by Judge Boyko. Counsel, let me just – during the course of the receivership, you submitted bills, and your hourly rate changed, right? Yes. When I say you, I mean the receiver. I know you. Okay. So the hourly rate changes, and it changes because the receiver is saying my reasonable hourly rate now is X, right? Like, how did that rate go up? You have to – for a rate to go up in a receivership, you need to apply to the court. Yes, but you chose the rate, right? Yes. How was that rate chosen? I don't know. The receiver chooses the rate, Judge. I mean it's not – I don't believe it's done scientifically. At least in my practice, it's not done scientifically when I raise my rates. It was basically whose rate was going up. Yes. A few years later, whose rate was going up. So these were the rates that the receiver himself felt was the reasonable hourly rate for his work, right? Yes. Yes. So at what point did that rate become unreasonable? When Judge Boyko determined and Magistrate Judge Greenberg determined that rate to be unreasonable, and just as those judges are capable of determining that the rate that has been charged for however long it's been charged, unreasonable under the circumstances and lowering it, which nobody argues the court can't do. Just like that, a judge looking at all of the factors that are looked at in cases like bankruptcy trustee cases, and Ingrid Wright is cited extensively by Magistrate Judge Greenberg, when you look at everything that occurred in this receivership, and no one knew what would occur in this receivership back in 2005 compared to 2013 or 2017. No one knew what would happen. So does it make it retroactively unreasonable? Yes. A judge can determine an amount to be retroactively unreasonable, and judges have done that numerous times when reducing the amount that's being paid to the receiver. Well, that's because of the amount that's left. But can you give me an argument that at least at the time the issue was raised – can you give me an argument that distinguishes between the time that the issue was raised and the fees that were already decided? An argument the time that the issue was raised regarding – you're talking about – when Judge Boyko raised it. I'm not sure I understand your question. Does it make sense to distinguish between the fees that were already paid and approved and requested before Judge Boyko raised this issue and the fees that followed? Yes. Yeah, now I understand. I apologize. When Judge Boyko made his ruling and changed the hourly rate to $459, Judge Boyko was looking at the factors that the court looks at in Wright, and those factors changed. Those factors changed when – and they changed significantly in 2008, for example, when the first sale of the Enitrac stock failed because of the financial crisis. And even though the receiver was billing at a rate that wasn't being paid and didn't get paid for a couple of years because there wasn't money to pay him, the judge determined that given the complexity of the matter, the result obtained, the amount of work required in this particular case warranted an increased hourly rate for the compensation to be reasonable. And it is unreasonable to think that a court can reduce a receiver's compensation and not think that the court has the authority to increase it as well. And again, that's – nobody will understand this case as well as the issue. You're being asked a question. Oh, I'm sorry. Your friend on your side, I think, characterized this as possibly a due process problem due to lack of notice or objection. I think Judge Rogers asked about that a little bit in terms of their ability to object. Can you talk about that? Sure. They have the ability. I think the questions were asked were clearly appropriate. There's no dispute over the bills that were approved stated the numbers of hours, stated the amount that was billed. The only change that Judge Boyko did was to the rate. And, I mean, the reason we're here is all parties have ample time to litigate that and to argue it and to appeal it. My name was invoked. I'd like to clarify what I see is the procedural due process problem that they raised. If somebody charges $50 an hour and then at the end of the job waives any challenge to how many hours he doesn't say, I charge more, I charge less. I agree that I have the person who's paying me says, I agree you work 50 hours. And I waive further ability to challenge that. Then later on, the court says, we're going to double that to $100. And then he says, well, if I had known it was $100, I might have challenged it back then. And I said, no, too late. You could have challenged it before when you thought it was 50. Now that it's 100, you still can't challenge it because you agreed not to challenge it. Wouldn't that be a procedural due process problem? In this instance, not only were – My first question is, would that be a problem the way I described it? I can certainly see how it could be, but our bills were challenged. We had hearings on these. When they knew how much per hour they were going to have to pay for those bills? Until the Initract sale, the fees and expenses of the receiver and his professionals were hotly contested amongst the parties to the case. And in fact, the statements that are quoted from Judge O'Malley are directly from a hearing related to the settlement of the Ferris Baker Watts litigation. Would the degree to which they challenged it be affected by how much they were? Yes, Judge. I think it's a little bit unfair to raise the stakes of a dispute and then say the dispute is all settled. Well, without giving – there was every opportunity to challenge the number of hours. I understand. I'm just saying isn't there some – I mean isn't there some thrust to their argument at least? That when you raise the stakes of something that you previously litigated, maybe you didn't get as full a chance when you didn't know that the stakes were going to be raised. I believe if you look at the challenges to the fees and expenses here that everyone received, not only due process, but had every opportunity. Doubling the stakes wouldn't have made any difference, is that what you're saying? I can't believe this – I don't believe this case could have been litigated any more closely than it was back in those days. When, frankly, everyone was concerned that Intertract was a closely held – a closely held asset, which we own the minority stake. And absent suing the officers and directors, we may never get a substantial recovery from it. Can you address the $160,000? Sure. The receiver through forensic accounting determined that the money that was used to purchase the home that was sold that resulted in $164,000 was money that David DeDante solicited from victims of his Ponzi scheme. And the money was subsequently seized. It is subject to a plan of distribution. I will – and Mr. Cohn knows this, it's not a jock to him. It is not the receiver's intent to recommend that it be distributed to Mrs. DeDante. We think Mrs. DeDante's argument that the $8.5 million has been cured by the receiver's recovery is inapplicable because Mr. DeDante and Mrs. DeDante signed an agreement that they were to pay $8.5 million irrespective of how much the receiver recovered from any other parties. So this is – the difference in the legal argument is this is not a non-settling defendant saying you've gotten your money. Okay. Do I understand what you're saying is that this isn't – this isn't her money that was being held. This was money that belonged to the partnership. This was money that was traced to the partnership and so it was never her money. Mrs. – Mr. DeDante, in my parlance, stole the money, used it to buy the house. The house was then sold, so the house was bought with stolen money, and the victims should get that money back. And the $8.5 million settlement saying that that's been satisfied by the receiver through other means is a bit of a ruse. Well, I don't know if it's a ruse. If you settled all of their liability for $8.5 million… They haven't paid it. Huh? They haven't paid the $8.5 million. We still have a judgment. Okay, okay. I'm saying because we sold stock that we owned and that brought more than $8.5 million. It does not mean Mr. DeDante gets credit for that. They only gave you the house. That was it. We sold the house for a little more than $1 million. Okay, and then there was one other thing. Yeah, yeah. The $8.5 million is nowhere near been paid. Did you have any questions? No questions. Thank you. Thank you. I have some support. There were a number of things in there I'd like to address. The first thing, and it is an important issue, what we call it to some extent, because it goes to the issue of how we ended up here and whether or not the investor's rights to object to what the court was really considering were allowed in each step of the procedural process here. This was referred to as a bonus. It was referred to as a bonus by the district court in its order 598 when it said it would consider the award of a bonus to the receiver. This construct, I'll call it, of changing the hourly rates and what went on there came up after the fact. But it wouldn't have come up if there hadn't been $5 million that the receiver requested the court to hold back and was sitting there to allow this conversation to occur. And I think it's important that you recognize that. The fact that this became a mechanism, the math that was done in the end, was not what the court really proposed. So if sometime during the proceedings the receiver went to court and said, I agree to a fee that was on the very, very low end of the Kennedy report, even maybe below the 25th percentile. And at the time we all believed that it was an appropriate rate because it was unlikely or it was very unclear about whether the plaintiffs would recover anything. Whether the people we made whole. We now know that there's considerable money and we've been able to negotiate to get rid of the margin. The staff has gone up. It's a completely different situation now. And I request that my fee be more in line with the higher end of the range. Would that be inappropriate for the judge to say, I think you're correct. I think this is a different receivership than we thought it was. The receiver at any time could have attempted to bargain for a different rate. The receiver could have requested a contingency fee agreement from the outset if he felt he was bringing to bear qualities and expertise that could result in what the court characterized as an extraordinary recovery. He did not do that. And I want to be clear. He did not even do that after the original Kennedy report issued. The original Kennedy report came out. His fees were determined reasonable. It showed another range of rates. Again, I don't think it's on point with the court to really do an analysis of whether those rates equated to what this receiver was doing in a case like this receivership. But still, even then, he never intimated in any way that he would request an increase of his rates. But once Judge Boyko raised it, and now I'm speaking about prospectively, not what preceded it. But prospectively, is it of use of discretion for Judge Boyko to reevaluate the nature of this receivership and increase the rate prospectively? I do think it would have been at this point, Your Honor, just based strictly on the Intertrack stock having had more value because we're talking about a limited partnership. This stock was always the property of the limited partnership, and these investors were entitled to the return on their business property. I do think that would be improper, and he was being compensated at a reasonable rate. It was his market rate. Judge Boyko was compensating him at his rate in other cases. I'm a little curious why you're so insistent on that. Most of the money that we're talking about would not fall in – most of the rates that were raised that equaled the $2 million or whatever it was were before he raised the rates, weren't they? They were. Nearly $3 million was already paid to the receiver under – I'm talking about payment. I'm talking about incurring. When the work was done for which he was paid, it was almost entirely prior to the decision of Judge Boyko to – That's correct. Like 90%? Right. That's correct. What happened after the interjection? So if we were to rule that it was okay prospectively but not okay retroactively, that would be a substantial victory. If I'm understanding the stakes in this case. It would be a substantial victory, and yet I don't believe that there was sufficient tying by the district court to show that the rate actually needed to be raised at that point because it was unreasonable. Neither of you is actually arguing that it be provided that way. No. It would be a different case, however, if the then-sitting judge had linked a raise to something that was going on under his watch. We're not trying to pivot the court. They did as it went along. They raised it. Right. They did raise their rates on their own. Those raises are not at issue in this case. The raises that the receiver gave himself were – even after the Kennedy reports came out – were again raised by the district court's judgment. I just want to say one more thing. What we are challenging is the quote-unquote bonus part where they're taking previous charges for previous work that was raised as they went along periodically. Right. What we are challenging is the – on top of that – overall percentage that virtually doubled at that point. They took additional increases. Just quickly, the reliance matters. Judge O'Malley specifically stated to these investors over and over that the fees were flat and they would not change in the future. And she did that to quell objections, as Judge Rogers was pointing out. So it did affect what they objected to. She was sad. She said, stop objecting. This is reasonable, and there's not going to be a contingency fee. And they did hold that. Just like in Mays v. Verratti, the court pointed out that in that case, the plaintiffs had relied on the fixed-fee arrangement in making settlements. And the same thing occurred here. There was also an assignment of error related to the court's determination about the hourly fee bills that went ahead. We fully briefed it, but we do not believe that it was sufficiently reviewed. There's a lot of vague and block-billed fees there and that they were not scrutinized on the level. And they put the burden back on the investors to try to figure out whether the work was reasonable for the receivership. We respectfully request the trial court's orders be reversed, and that the interest and the money that was allocated for the bonus be ordered to be paid to the investors, and that the receiver only receive his hourly fee bill compensation that was submitted to the extent that it's been proved to be for the benefit of the receivership estate. Thank you. Your Honor, just a few quick points. The settlement agreement that produced the stipulated judgment entry did not provide that the judgment would be for $8.5 million, irrespective of what the receiver got from everyone else. It provided for $8.5 million, period. David DeDante was the only substantive defendant in the case. There were other defendants named as stakeholder defendants. In other words, defendants who had possession of property belonging to the partnership. He was the only defendant, and this was the only substantive judgment that was entered in this case. So why aren't you claiming that you're as judge – I'm just – why aren't you entitled to all the excess? Because the – there's two reasons why. One is that stakeholder defendants owned property that was – belonged to the partnerships. David DeDante would have no claim to that. Secondly, one of the elements of damage that was ascribed to Mr. DeDante was that this Innitrack stock that he bought became valueless. Well, they got back the Innitrack stock. Lo and behold, it wasn't valueless. It turned out to produce $35 million. That is their money, and there was no way that David – But why – I guess I don't understand what that has to do with the fact that he agreed to an $8.5 million judgment against him. But that – I guess it speaks to a different point, Your Honor. And that is that the overlap between the $8.5 million and the amount they recovered, it both addresses the same sort of misconduct. It does. He doesn't have any claim on anything over and above what the receiver recovered. He doesn't. Because in the settlement agreement, the other point that I wanted to make that I forgot is that he ceded right and title to everything that the receiver had collected to the receiver to go toward satisfaction of the $8.5 million. So he didn't have a right to claim anything. So the second point being that the amount that the receiver did recover necessarily overlapped with the liability that was covered by the $8.5 million. It's evidenced by the fact that part of it was for the supposedly worthless Innitrack stock that he bought and the fact that it turned out not to be worthless and produced a bounty. Thank you. Thank you. Case to be submitted. Thank you all.